Helen **HANNA** and Cicero Hanna,
Appellants,

v.

Annie C. **FLETCHER**, Trustee of the Estate of Florence Johnson, and Fred S. Gichner Iron Works, Inc., Appellees.

No. 13950.

United States Court of Appeals
District of Columbia Circuit.

Argued April 25, 1958.

Decided Oct. 2, 1958.

Petition for Rehearing In Banc Denied
Nov. 5, 1958.

Mr. Paul R. Connolly, Washington, D. C., with whom Mr. Jeremiah C. Collins, Washington, D. C., was on the brief, for appellant Helen Hanna.

Mr. Hugh Lynch, Jr., Washington, D. C., was on the brief for appellant Cicero Hanna. Mr. Charles E. Channing, Jr., Washington, D. C., also entered an appearance for appellant Cicero Hanna.

Mr. David G. Bress, Washington, D. C., for appellee Fletcher.

Mr. Richard W. Galiher, Washington, D. C., with whom Messrs. William J. Donnelly, Jr., Julian H. Reis and H. Mason Welch, Washington, D. C., were

on the brief, for appellee Gichner Iron Works, Inc.

Before EDGERTON, Chief Judge, and BAZELON and DANAHER, Circuit Judges.

BAZELON, Circuit Judge.

In May 1949, the iron handrail of the outside steps of a house owned by appellee Fletcher gave way as Helen Hanna, a tenant, was using it for support. She fell off the steps into an areaway, suffering injuries which left her paralyzed. She and her husband brought suit in the District Court against Fletcher and the Fred S. Gichner Iron Works, Inc., a contractor to whose allegedly negligent repair of the railing in 1942 the plaintiffs attributed the accident.

On the first trial, the District Court directed judgment for the defendants upon the opening statement of plaintiffs' counsel. We reversed and remanded, holding that plaintiffs would be entitled to recover from both defendants if they could establish the allegations of the opening statement—that the accident was the proximate result of the contractor's negligently executed repair job. Hanna v. Fletcher, 1956, 97 U.S.App.D.C. 310, 231 F.2d 469, 58 A.L.R.2d 847. Upon remand the District Court again directed judgment in favor of the defendants, this time at the conclusion of the plaintiffs' case,[1] and the plaintiffs have again appealed. The issue now before us is whether the plaintiffs produced evidence from which the jury could have found the injury to have been proximately caused by negligence on the part of the contractor.

From the evidence introduced, the jury could have found the following facts:

1. The handrail was an iron pipe fitting into collars affixed to two hollow newel posts, one on the upper landing and the other on the bottom step. The lower newel post was fastened to the step by an anchor rod passing down through the post and through the step and nutted on the underside of the step.

2. The state of disrepair existing at the time of the 1942 repair job consisted, as the contractor knew or should have known, of the following:

a. The lower anchor rod had rusted through at its point of contact with the step.

b. The step was off-level, sloping down toward the rusted anchor rod.

c. The contact between the step and the newel post through which the rusted anchor rod passed was not sealed by calking, soldering or otherwise.

d. There was a hole in the upper collar through which moisture could enter and run down through the railing into the lower newel, accumulating at the point of contact between the anchor rod and the step.

3. The contractor's repairs in 1942 consisted of cleaning away the accumulated rust, replacing the old anchor rod by a new one and re-assembling the railing and newel. The contractor did not level the step to prevent water drainage toward the newel. Nor did it seal the seam around the base of the newel. Nor did it close the hole in the upper collar.

4. The 1949 collapse of the railing, which caused Mrs. Hanna to fall, resulted from the rusting through of the anchor rod the contractor had installed in 1942, which caused the newel post to topple and the railing to fall out of the collars.

■ On the foregoing facts alone, if the jury had found them, it could have concluded that the 1949 accident was the

1. In what respects the plaintiffs' showing was inadequate the trial judge did not say. His ruling was:

"Gentlemen, as I see it, it would be futile for me to attempt a review of the record which has been made in this court in the last seven days, and any effort to do so would certainly be inadequate. I prefer to place my ruling squarely upon the record as it stands, and doing so, I must announce that the Court finds that the plaintiffs, there are two of them, have failed to make a prima facie case. Accordingly, the motion of each defendant against each plaintiff will be granted."

proximate result of a negligent repair job performed by the contractor in 1942. It could have reasoned that the sloping step, the unsealed seam at the base of the newel post, and the hole in the upper collar, facilitated the access of moisture to the anchor rod and caused it to rust through more rapidly than if the step had been leveled, the seam sealed and the hole closed.

 No expert testimony was needed to support a determination that the contractor's omission to level the step, seal the seam and close the hole was a failure to use reasonable care in doing the repair job in 1942. But even if expert testimony were necessary to establish the standard of reasonable care, such testimony was given by the witness Locraft.[2] Similar testimony by the witness Vetterman, an iron worker and instructor in iron work at Bell Vocational School, was proffered, but rejected by the trial judge on the ground that the witness was not qualified as an expert in this case because he had worked on only one iron staircase precisely like the one here involved. We think the record shows the witness to be thoroughly qualified to express the sort of opinion sought to be elicited from him. The basis upon which his testimony was rejected was unduly restrictive and arbitrary.

We hold that it was error to take the case from the jury. We reverse the judgment and remand the case to the District Court for a new trial.

We think it unnecessary to rule on the numerous other alleged errors of which appellants complain. The District Court's usual practice, with respect to a case remanded for a new trial, is not to assign it to the same judge. Hence the questions raised, which relate largely to evidentiary restrictions, may not arise.

Reversed and remanded.

DANAHER, Circuit Judge (dissenting).

This is a sad case, for Mrs. Hanna was devastatingly injured. This is a hard case, indeed it survived the first appeal only because the court wrote new law.[1] The majority in 1956 pointed out: "Of course we do not say there was negligence; the offers made in the opening statement might not materialize in essential respects in the evidence * * *." Again the court said, "As we have seen, the opening statement contains detailed specifications of omissions and negligent acts in the course of the repair work. Whether true or not we do not know; that was for proof at a trial * * *." It is clear from the record before us that no one could have been more keenly aware of the problem of proof than Mrs. Hanna's counsel.

Following this court's 1956 opinion, counsel was bound to reappraise his case as he prepared for trial. He knew that the lower right newel post had been in position when Gichner's men went to repair the steps in 1942, that the railing was intact and that the repairmen had to remove the newel post to get at the anchor rod.[2] He knew that Mrs. Hanna had lived in the premises for some nine

---

2. The trial judge subsequently ruled that the witness, a civil engineer and a member of the District of Columbia Commissioners' Board of Unsafe Structures, was not qualified to give an opinion as to reasonable standard of repairs because his experience related mainly to new construction. We think the record shows the witness to be eminently qualified to give an opinion.

1. Hanna v. Fletcher, 1956, 97 U.S.App.D. C. 310, 231 F.2d 469, 474, 58 A.L.R.2d 847, certiorari denied Gichner Iron Works, Inc., v. Hanna, 1956, 351 U.S. 989, 76 S.Ct. 1051, 100 L.Ed. 1501.

2. The majority errs, I think, in its finding No. 4. The record does not establish that the 1949 collapse resulted from the rusting through of the anchor rod installed in 1942, hence the contractor's conduct in 1942 was not shown to have caused the lower newel post to "topple" or the railing to "fall out of the collars." The record shows Mrs. Hanna testified that never that she "knew of" had the right railing become "loose, shaky and wobbly." Her complaint was and had been about the shaky steps.

years at that time and that no previous repairs had been made to the steps or to the railings. The left-hand railing and the newel posts, so far as had been disclosed, had never developed defects. Counsel knew that Speiser, the repairman, would say he had taken out two handfuls of rust, and had chipped away the hard rust.[3] He would testify that after cleaning away the rust he had applied red prime paint where the rust had been. Speiser would say that the first three or four steps on the stairs had been loose and Speiser and his helper had installed vertical plates in the risers and had bolted them in. The newel post would "sit perfectly vertical" and would "take the rods coming from the upper newel post, without the bottom step being level," Speiser was to say. Thus the anchor rod would and did seat the newel post on the bottom of the step, according to the witness, and "When I left, that newel was solid." He also would testify that the step never had been level. Of course, counsel realized that Gichner was not liable for construction of the steps, 50 years earlier. Counsel must have considered Gichner was not bound to rebuild the steps or to substitute a concrete stairway for the iron; he had been employed simply to repair and tighten up the shaky steps.

As Mrs. Hanna's counsel thus appraised his problem, he knew the record would fairly show that when Gichner completed his 1942 repairs, the steps had been firmed by the plates and the bolts. Counsel knew he had no evidence that the steps had ever fallen or given away at any time. The same was true as to the left-hand banister and newel posts. By virtue of his careful preparation and from the pre-trial depositions, Mrs. Hanna's counsel had definite knowledge as to what testimony he could develop as well as of the nature of what he hoped to establish. He was confronted by the fact that although the anchor rod had rusted out at some undetermined time prior to 1942, the newel posts and the banister on the right-hand side had remained intact. They had not fallen. He had to pitch his entire case on the fact that a concealed anchor rod in the lower right newel post had rusted through, and then to ascribe to that failure the collapse of "the whole banister." The challenge was formidable, at best.

At the trial, Mrs. Hanna's counsel developed "the use of the steps by 7 or 8 people living in the house." These people, between 1942 and 1949 included at least Mrs. Hanna's roomers, a Mr. and Mrs. Goodman, Mrs. Hanna's brother and sister who were living with her at the time of the accident, and during part of the time, her two sisters. Not one of these people appeared as a witness. The appellant husband, Cicero Hanna, lived there from 1933 until some time after the wife's fall when he was evicted for non-payment of rent. Although Mrs. Hanna's present counsel had appeared as well for her husband at the time of the first appeal, he did not represent him at the later trial, here reviewed. He not only refused to be bound by the appellant husband's testimony, he informed the trial judge that he "was unwilling to vouch for his credibility." He insisted on building his "case on liability in my own way and I can do so without using Cicero Hanna." Hanna testified under examination by his own counsel, but his various versions of circumstances may have seemed less than satisfactory to all concerned. The wife's counsel declined to cross-examine him, perhaps having concluded that the obvious confusion of the husband had added nothing to the case.

Faced by this sort of situation as the case went forward for the second time, Mrs. Hanna's counsel advanced a new theory. This time, in seeking to establish the repairman Gichner's liability, his opening statement charged that in the course of repairing the steps, Gichner's employee in 1942 had set up an inherently dangerous condition of a special sort.

3. Counsel on October 27, 1956, took the deposition of the repairman Speiser who had serviced the steps in 1942.

The employee had used dissimilar metals, it was claimed, mild steel and cast iron which, in combination and when joined by water, created a galvanic reaction.[4] This condition promoted excessive rusting, it was said. Thus, over the period of seven years between 1942 when the repairs were made and 1949 when Mrs. Hanna fell, the anchor rod inside the lower right newel post had rusted away. Accordingly, it was claimed, since Gichner had created a specified inherently dangerous condition in 1942, his conduct in 1942 constituted negligence and "that negligence was a cause of Helen Hanna's injuries." Judge Fahy, writing for the majority in 1956 had said: "We come to the question whether the opening statement made a case to go to the jury against Gichner on both negligence and proximate cause. If wanting *in either respect* the directed verdict was correct." [5] (Emphasis supplied.) Thus, we are now precisely at the point of determining whether if the proof was wanting in either respect, Judge Letts erred in directing a verdict for the defendants at the close of appellants' case.

The house had been built in 1892. Mrs. Hanna became a month to month tenant in 1933. By 1939 or 1940 the iron steps had become loose. Since they "rattled a lot," and were "shaky," Mrs. Hanna became concerned and reported that condition to the landlord. Although she used the steps every day, and sometimes several times a day, when asked if "the right-hand railing was still firm and steady and had never gotten loose, shaky or wobbly," she replied, "Not that I know of." After the 1942 repairs, "The steps were tighter" and as to the railing, "The whole thing seemed in good condition."

Some five years later, the iron railing between the *upper* newel post and the *wall of the house* had "pulled away from the wall." Mrs. Hanna's counsel asked what was done about it, and Mrs. Hanna replied "They put something like a bunch of putty there and stuck it back." Whoever made the repairs in 1947 cannot be discerned from this record. Gichner, however, had nothing to do with such repairs. Mrs. Hanna was questioned by her counsel and answered as to the 1947 failure, thus:

"Q. Helen, when this railing that extends back to the wall pulled out, did anything you could observe happen to the upper newel post, the railings and the lower newel post? A. They were shaky at first.

"Q. Shaky at first, but when the railing came loose from the wall, did that affect, as far as you can tell, this lower newel post at all? A. It seemed like the whole banister was loose.

"Q. When are you speaking of now? A. When the rail came out the wall.

"Q. The whole banister was loose? A. Yes.

"Q. Somebody put some putty at the top? A. That is right."

On cross-examination Mrs. Hanna testified that in 1947 she had reported to the landlord that the railing had come loose from the *wall*. A few days later, the 1947 repairs were made. Mrs. Hanna did not know who had made them —but it was not Gichner!

Two years later, in May 1949, Mrs. Hanna on leaving the porch, had descended two steps. She had taken hold of the *top* hand rail. The railing gave way and she plunged to her injury. As her counsel put it to the trial court:

"Mrs. Hanna, when she was on the stand, testified *in four places and I have the record,* that when she fell *the whole banister* came down. Now, this gentleman is going to say that when he got to the scene of the

---

4. Like materials had been utilized in the original construction, but there was no evidence as to whether the physical conditions now complained of produced the 1942 rusting in 50 years or any other specific period.

5. See note 1 supra; 97 U.S.App.D.C. at page 313, 231 F.2d at page 472.

accident, he found *the whole banister* down alongside of the house and, furthermore, he is going to testify, if he sticks to his deposition, that the anchor rod inside the lower right newel was rusted completely through approximately at the point where it pierced the bottom tread." (Emphasis supplied.)

The witness Ralston, Gichner's repairman who repaired the steps after the 1949 collapse, did so testify. Thus, Mrs. Hanna's counsel was seeking to establish that the whole banister collapsed and fell. Whether it first pulled away from the wall as in 1947, we do not know. Mrs. Hanna could not testify whether the banister first pulled away at the wall of the house or at some other point, or whether the upper newel post next gave way. We are asked to speculate that the whole banister fell down because the anchor rod in the *lower* right newel post was found, after the accident, to have been rusted through. Yet *all* the testimony was, except for the 1947 episode, that up to the time of the 1949 collapse, that railing was firm.

To supply what he surely knew was a missing link, counsel called as an expert witness a civil engineer, Mr. Locraft. Mrs. Hanna's counsel marshalled for the witness the facts he claimed to have proved as to what Gichner's men had done or had failed to do in 1942 and thereupon added:

"I then want you to assume, sir, the passage of seven years with the occurrence of the ordinary weather conditions in Washington, hot and cold, clear and rain, and the use of the steps by seven or eight people living in the house, probably occasionally people bumping into the post or children perhaps grabbing the post as they go into the house; I then want you to assume a date in 1949, seven years later, when the new rod that was inserted in 1942 again rusted completely through at the same point it had rusted through

in 1942, just slightly above the place where the bottom step is penetrated.

"Now, sir, from those facts, are you capable of expressing an opinion with reasonable certainty as to what caused the failure of the newel post in 1949?"

The witness replied that the rod had failed because electrolysis had set in. Then, in technical terms, he explained the processes of corrosion where dissimilar metals are bonded when water strikes such metals. In short, he explained fully the cause of the rusting of the anchor rod. He did not link the total result, the collapse of the whole banister, to the rusted anchor rod, rusted in 1949, it was claimed, as it had been in 1942 when there was no such collapse. He could not have done so for a critical hiatus is clear.

Omitted from the hypothetical question was *any reference whatever to the 1947 episode*. Omitted from the case altogether is any evidence that the anchor rod in the lower right newel post *first* let go, and thereafter precipitated "the whole banister" and Mrs. Hanna into the areaway.

That the anchor rod had rusted through we cannot doubt. There is no evidence as to the condition of the upper newel post and anchor rod. There is no evidence as to the condition of the railing which, after pulling away from the wall in 1947, had been put back with "putty" around it. Mrs. Hanna said, not once but four times, that the whole banister gave way, newel posts, rails and all. The repairman Ralston said the same thing. The court was asked to speculate then, that a rusted anchor rod in 1949 had precipitated the collapse of the whole banister when with a like rusted anchor rod in the same post in 1942 the banister had not given away at all.

Of course, we must grant to Mrs. Hanna every favorable intendment from the whole evidence. Still, it cannot fairly be said to have been shown that Gichner's efforts to repair the shaky steps in 1942 had caused in 1949 the collapse of

the whole banister. Much less can it be said if Gichner was shown to have been at fault in 1942, that his conduct in natural sequence, was unbroken by any efficient intervening cause, and hence produced the injury.[6]

If the appellants' case is "wanting in either respect the directed verdict was correct," as Judge Fahy wrote.[7] I submit the appellants' proof failed in "either" or both respects. Accordingly Judge Letts was bound to rule as he did, and the judgment should be affirmed.

---

6. Id., 97 U.S.App.D.C. at page 316, 231 F.2d at page 475.

